**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| IN RE: NOVEMBER 3, 2020 GENERAL ELECTION | : | No. 149 MM 2020 |
| | : | |
| | : | |
| | : | |
| PETITION OF: KATHY BOOCKVAR, SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA | : | SUBMITTED: October 16, 2020 |
| | : | |
| | : | |

**OPINION**

**JUSTICE TODD**                                                    **DECIDED: October 23, 2020**

On October 14, 2020, our Court granted the application of the Secretary of the Commonwealth, Kathy Boockvar ("Secretary"), to assume King's Bench jurisdiction[1] and consider her request for declaratory relief, limited to answering the following question: "Whether the Election Code[2] authorizes or requires county election boards to reject voted absentee or mail-in ballots during pre-canvassing and canvassing[3] based on signature

---

[1] As we have recently explained, our Court's King's Bench jurisdiction is derived from Article V, § 2 of the Pennsylvania Constitution and 42 Pa.C.S. § 502, and "is generally invoked to review an issue of public importance that requires timely intervention by the court of last resort to avoid the deleterious effects arising from delays incident to the ordinary process of law." *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 884 (Pa. 2020). We may exercise this power of review even where, as here, no dispute is pending in a lower court of this Commonwealth. *Id.*

[2] The Pennsylvania Election Code, 25 P.S. §§ 2600-3591 ("Election Code" or "Code").

[3] As defined by the Election Code, the process of "pre-canvassing" is "the inspection and opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes and the counting, computing and tallying of the votes reflected on the ballots. The term does not include the recording or publishing of the votes reflected on the ballots." 25 P.S. § 2602. The process of "canvassing" is "the gathering

analysis where there are alleged or perceived signature variances?" *In Re: November 3, 2020 General Election, Petition of Kathy Boockvar, Secretary of the Commonwealth of Pennsylvania*, 149 MM 2020, 2020 WL 6110774 (Pa. filed Oct. 14, 2020) (order). For the reasons that follow, we conclude that the Election Code does not authorize or require county election boards to reject absentee or mail-in ballots during the canvassing process based on an analysis of a voter's signature on the "declaration"[4] contained on the official ballot return envelope for the absentee or mail-in ballot. We, therefore, grant the Secretary's petition for declarative relief, and direct the county boards of elections not to reject absentee or mail-in ballots for counting, computing, and tallying based on signature comparisons conducted by county election officials or employees, or as the result of third-party challenges based on such comparisons.

## I. Facts and Procedural History

As our Court has recently observed, "[i]n October 2019, the General Assembly of the Commonwealth of Pennsylvania enacted Act 77 of 2019,[5] which, *inter alia*, created for the first time in Pennsylvania the opportunity for all qualified electors to vote by mail, without requiring the electors to demonstrate their absence from the voting district on

---

[4] The voter's declaration is a pre-printed statement required to appear on the ballot return envelope containing a voter's absentee or mail-in ballot declaring: that the voter is qualified to vote the ballot enclosed in the envelope, and that the voter did not already vote in the election for which the ballot was issued. 25 P.S. § 3146.2. The declaration also contains lines for the voter to print his or her name and address, a space for the voter to sign his or her name or make a mark if unable to sign, and a space for the voter to enter the date on which he or she executed the declaration. *Id.* § 3146.6.

[5] Act of October 31, 2019, P.L. 552, No. 77 (hereinafter, "Act 77").

of ballots after the final pre-canvass meeting and the counting, computing and tallying of the votes reflected on the ballots." *Id.* § 2602. At times herein, we refer to these two stages broadly as "canvassing."

Election Day." *Pennsylvania Democratic Party v. Boockvar*, 2020 WL 5554644, at *1 (Pa. Sept. 17, 2020). Subsequently, in March 2020, the legislature made further revisions to the Election Code via the passage of Act 12 of 2020,[6] which, among other things, authorized for the June 2, 2020 primary election,[7] and for all subsequent elections, the mail-in voting procedures established by Act 77.[8]

Because of the substantial nature of the recent Code amendments, as well as the anticipated massive increase in the number of mail-in and absentee ballots which county boards of elections would be confronted with due to the COVID-19 pandemic, in order to ensure that the procedures set forth in the Election Code regarding pre-canvassing and canvassing of absentee and mail-in ballots would be uniformly applied and implemented by county boards of elections, Secretary Boockvar issued two written guidance documents for those boards to follow when canvassing such ballots.

In the first guidance document issued on September 11, 2020 to all county boards, Secretary Boockvar set forth the procedure the boards were to follow upon receipt of an absentee or mail-in ballot. This guidance directed the county boards to examine the declaration contained on the ballot return envelope containing the absentee or mail-in ballot. It further directed the county board to "compare the information on the outer envelope, i.e., the voter's name and address, with the information contained in the 'Registered Absentee and Mail-In Voters File, the absentee voter's list and/or the Military Veterans' and Emergency Civilians Absentee Voters File.'" Pennsylvania Department of State, *Guidance Concerning Examination of Absentee and Mail-In Ballot Return*

---

[6] Act of March 27, 2020, P.L. 41, No. 12 (hereinafter, "Act 12").
[7] This election was rescheduled from May 17, 2020 due to the COVID-19 pandemic.
[8] We collectively refer to Act 77 and Act 12 as the "recent Code amendments."

*Envelopes*, 9/11/20, at 3, *available at* https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/Examination%20of%20Absentee%20and%20Mail-In%20Ballot%20Return%20Envelopes.pdf. The Secretary advised that, if the declaration is signed and the county board is satisfied that the declaration is sufficient, then the absentee or mail-in ballot should be approved for canvassing unless it is challenged in accordance with the Election Code. The Secretary specifically cautioned the county boards of elections in this regard that "[t]he Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." *Id.*

Subsequent to our Court's decision in *Boockvar*, *supra*, the Secretary issued supplemental guidance to all county boards concerning, *inter alia*, matters addressed by our decision – *i.e.*, the establishment by county boards of satellite offices, provision of drop boxes for voters to return absentee and mail-in ballots, and the mandatory requirements that such ballots be returned only by the voter and be enclosed in a secrecy envelope. In this supplemental guidance, the Secretary also directed the county boards to set aside ballots which were returned to them without the declaration envelope having been "filled out, dated and signed." Pennsylvania Department of State, *Guidance Concerning Civilian Absentee And Mail-In Ballot Procedures*, 9/28/20, at 9, *available at* https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/DOS%20Guidance%20Civilian%20Absentee%20and%20Mail-In%20Ballot%20Procedures.pdf. This guidance buttressed her earlier instruction, reiterating that "[t]he Election Code does not permit county election officials to reject applications or voted ballots based solely on

signature analysis. . . . No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." *Id.*

Meanwhile, Intervenors in the instant matter, Donald J. Trump for President, Inc., and the Republican National Committee, filed suit in the United States District Court for the Western District against the Secretary over several election issues.[9] *See Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966 (W.D. Pa.). In response to the Secretary's guidance to the county boards, on September 23, 2020, Intervenors filed an amended complaint in that matter challenging Secretary Boockvar's interpretation of the Election Code as precluding county boards from rejecting absentee and mail-in ballots based on a signature comparison.

On October 1, 2020, Intervenors filed a motion for summary judgment in the federal action alleging, *inter alia*, that the Secretary's guidance was contrary to the Election Code and, thus, constituted an infringement on the "fundamental right to vote and to a free and fair election." Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment *filed in Donald J. Trump for President, Inc. v. Boock*var, No. 2:20-cv-966 (W.D. Pa.) (Exhibit D to Secretary's Application for Extraordinary Relief), at 15-19, 45-50. Intervenors sought, as relief, the entry of an injunction directing the Secretary to withdraw her guidance, and, also, to require county boards of elections to compare signatures on

---

[9] This lawsuit challenged, as an alleged violation of the due process and equal protection guarantees of the 14th Amendment to the United States Constitution, *inter alia*, the Secretary's allowance in the upcoming election of the use of drop boxes, satellite election offices for the collection of absentee and mail-in ballots, and the counting of ballots which were returned without a secrecy envelope, and the requirement in the Election Code that poll watchers reside in the county in which they sought to serve in this capacity.

applications for absentee and mail-in ballots, and the ballots themselves, with the voter's permanent registration record. *Id.*

The Honorable J. Nicholas Ranjan denied Intervenors' motion for summary judgment, and granted judgment in favor of the Secretary. *Donald J. Trump for President, Inc. v. Boockvar*, 2020 WL 5997680 (W.D. Pa. filed Oct. 10, 2020) (hereinafter "*Trump*"). Relevant to the present dispute, in his scholarly and comprehensive supporting opinion, Judge Ranjan concluded that "the plain language of the Election Code imposes no requirement for signature comparison for mail-in and absentee ballots and applications." *Trump* at *53. In reaching this conclusion, Judge Ranjan analyzed the provisions of the Election Code governing pre-canvassing and canvassing of absentee and mail-in votes returned by the elector, set forth in Section 3146.8(g), which provides:

**§ 3146.8. Canvassing of official absentee ballots and mail-in ballots**

* * *

(g)(1)(i) An absentee ballot cast by any absentee elector as defined in section 1301(a), (b), (c), (d), (e), (f), (g) and (h) shall be canvassed in accordance with this subsection if the ballot is cast, submitted and received in accordance with the provisions of 25 Pa.C.S. Ch. 35 (relating to uniform military and overseas voters).

(ii) An absentee ballot cast by any absentee elector as defined in section 1301(i), (j), (k), (l), (m) and (n), an absentee ballot under section 1302(a.3) or a mail-in ballot cast by a mail-in elector shall be canvassed in accordance with this subsection if the absentee ballot or mail-in ballot is received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election.

(1.1) The county board of elections shall meet no earlier than seven o'clock A.M. on election day to pre-canvass all ballots received prior to the meeting. A county board of elections

shall provide at least forty-eight hours' notice of a pre-canvass meeting by publicly posting a notice of a pre-canvass meeting on its publicly accessible Internet website. One authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed. No person observing, attending or participating in a pre-canvass meeting may disclose the results of any portion of any pre-canvass meeting prior to the close of the polls.

(2) The county board of elections shall meet no earlier than the close of polls on the day of the election and no later than the third day following the election to begin canvassing absentee ballots and mail-in ballots not included in the pre-canvass meeting. The meeting under this paragraph shall continue until all absentee ballots and mail-in ballots received prior to the close of the polls have been canvassed. The county board of elections shall not record or publish any votes reflected on the ballots prior to the close of the polls. The canvass process shall continue through the eighth day following the election for valid military-overseas ballots timely received under 25 Pa.C.S. § 3511 (relating to receipt of voted ballot). A county board of elections shall provide at least forty-eight hours' notice of a canvass meeting by publicly posting a notice on its publicly accessible Internet website. One authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are canvassed.

(3) When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that

the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

(4) All absentee ballots which have not been challenged under section 1302.2(c) and all mail-in ballots which have not been challenged under section 1302.2-D(a)(2) and that have been verified under paragraph (3) shall be counted and included with the returns of the applicable election district as follows:

(i) The county board shall open the envelope of every unchallenged absentee elector and mail-in elector in such manner as not to destroy the declaration executed thereon.

(ii) If any of the envelopes on which are printed, stamped or endorsed the words "Official Election Ballot" contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void.

(iii) The county board shall then break the seals of such envelopes, remove the ballots and count, compute and tally the votes.

(iv) Following the close of the polls, the county board shall record and publish the votes reflected on the ballots.

(5) Ballots received whose applications have been challenged and ballots which have been challenged shall be placed unopened in a secure, safe and sealed container in the custody of the county board until it shall fix a time and place for a formal hearing of all such challenges, and notice shall be given where possible to all absentee electors and mail-in electors thus challenged and to every individual who made a challenge. The time for the hearing shall not be later than seven (7) days after the deadline for all challenges to be filed. On the day fixed for said hearing, the county board shall

proceed without delay to hear said challenges, and, in hearing the testimony, the county board shall not be bound by the Pennsylvania Rules of Evidence. The testimony presented shall be stenographically recorded and made part of the record of the hearing.

(6) The decision of the county board in upholding or dismissing any challenge may be reviewed by the court of common pleas of the county upon a petition filed by any person aggrieved by the decision of the county board. The appeal shall be taken, within two (2) days after the decision was made, whether the decision was reduced to writing or not, to the court of common pleas setting forth the objections to the county board's decision and praying for an order reversing the decision.

(7) Pending the final determination of all appeals, the county board shall suspend any action in canvassing and computing all challenged ballots received under this subsection irrespective of whether or not appeal was taken from the county board's decision. Upon completion of the computation of the returns of the county, the votes cast upon the challenged official absentee ballots that have been finally determined to be valid shall be added to the other votes cast within the county.

25 P.S. § 3146.8(g) (footnotes omitted).

Judge Ranjan discerned nothing in the text of these provisions which requires county boards of elections to "verify" the signatures on mail-in and absentee ballots – that is, to examine the signatures to determine whether or not they were authentic, *Trump* at *53, and thus rejected Intervenors' argument that Section 3146.8(g)(3) requires county boards of elections to engage in signature comparison and verification. In Judge Ranjan's view, the county board of elections is required under this statutory provision to verify only the proof of the voter's identification by examining the voter's driver's license number, the last four digits of his or her social security number, or other specifically approved form of

identification which is required by Section 2602(z.5) of the Election Code.[10]  Indeed, Judge Ranjan noted that nowhere in Section 3146.8(g)(3) does the term "signature" appear.  *Trump*, at *55.

---

[10] This statutory section provides:

> The words "proof of identification" shall mean:
> (1) In the case of an elector who has a religious objection to being photographed, a valid-without-photo driver's license or a valid-without-photo identification card issued by the Department of Transportation.
> (2) For an elector who appears to vote under section 1210, a document that:
>> (i) shows the name of the individual to whom the document was issued and the name substantially conforms to the name of the individual as it appears in the district register;
>> (ii) shows a photograph of the individual to whom the document was issued;
>> (iii) includes an expiration date and is not expired, except:
>>> (A) for a document issued by the Department of Transportation which is not more than twelve (12) months past the expiration date; or
>>> (B) in the case of a document from an agency of the Armed forces of the United States or their reserve components, including the Pennsylvania National Guard, establishing that the elector is a current member of or a veteran of the United States Armed Forces or National Guard which does not designate a specific date on which the document expires, but includes a designation that the expiration date is indefinite; and
>> (iv) was issued by one of the following:
>>> (A) The United States Government.
>>> (B) The Commonwealth of Pennsylvania.
>>> (C) A municipality of this Commonwealth to an employee of that municipality.
>>> (D) An accredited Pennsylvania public or private institution of higher learning.
>>> (E) A Pennsylvania care facility.
> (3) For a qualified absentee elector under section 1301 or a qualified mail-in elector under section 1301-D:

Judge Ranjan found that, while 25 P.S. §§ 3146.6(a) and 3150.16(a) require a voter submitting an absentee or mail-in ballot to "fill out and sign the declaration" printed on the ballot return envelope, the county board's duty under these sections is merely to examine the declaration and determine if these requirements have been comported with. Critically, in his view, this language did not require that a county board inquire into the authenticity of the signature; rather, the county boards were required to determine only that a voter had supplied his signature in the declaration.

Judge Ranjan observed that, by contrast, other provisions of the Election Code such as those governing in-person voting, *see* 25 P.S. § 3050(a.3)(2), allow a vote to be challenged where a voter's signature on the voting certificate executed at the polls is deemed not to be authentic when compared to the signature recorded in the district register of voters. Likewise, other sections of the Election Code allow boards of elections to reject provisional ballots based on an election official's conclusion that the voter's signature on the ballot envelope is not authentic, *see* 25 P.S. § 3050(a.4)(5)(i)-(ii), and allow election officials to reject nominating petitions based on the official's conclusion that

---

(i) in the case of an elector who has been issued a current and valid driver's license, the elector's driver's license number;
(ii) in the case of an elector who has not been issued a current and valid driver's license, the last four digits of the elector's Social Security number;
(iii) in the case of an elector who has a religious objection to being photographed, a copy of a document that satisfies paragraph (1); or
(iv) in the case of an elector who has not been issued a current and valid driver's license or Social Security number, a copy of a document that satisfies paragraph (2).

25 P.S. § 2602(z.5) (footnotes omitted).

the signatures contained therein are not authentic, *see* 25 P.S. § 2936. From Judge Ranjan's perspective, these provisions of the Code demonstrated that the Pennsylvania General Assembly knew how to require signature verification when they so desired, and the fact they did not do so in Section 3146.8(g)(3) indicated that signature verification was not a requirement for absentee or mail-in ballots.

Judge Ranjan also considered the effect of interpreting Section 3146.8(g)(3) to require signature comparison. In his view, doing so would create a risk that voters would be disenfranchised, given that mail-in and absentee ballots are kept securely stored until election day when the pre-canvassing process begins, and the Election Code contains no requirement that voters whose ballots are deemed inadequately verified be apprised of this fact. Thus, unlike in-person voters, mail-in or absentee voters are not provided any opportunity to cure perceived defects in a timely manner.[11]

In the instant matter, on October 4, 2020, just before Judge Ranjan issued his decision, Secretary Boockvar filed with this Court an application seeking invocation of our King's Bench authority, and seeking, *inter alia*, a declaration that, under the Election Code, county boards of elections are precluded from rejecting absentee or mail-in ballots at canvassing based upon signature comparisons, in accordance with her guidance to the county boards. Thereafter, the Secretary submitted a letter to our Court pursuant to Pa.R.A.P. 2501 apprising us of Judge Ranjan's decision. In this letter, the Secretary

---

[11] Judge Ranjan additionally rejected Intervenors' claims that a lack of signature comparison requirements violated the guarantees of the United States Constitution to substantive due process and equal protection. Because the present issue which we have accepted for our King's Bench review concerns only a pure question of state law involving interpretation of our Commonwealth's Election Code, we need not discuss Judge Ranjan's resolution of those claims.

noted that Judge Ranjan's opinion concluded that her guidance to the county boards of elections was "uniform and non-discriminatory" and "informs the counties of the current state of the law as it relates to signature comparison." Secretary's Letter to Supreme Court Prothonotary, 10/11/20, at 2 (quoting *Trump* at *61). Nevertheless, recognizing that our Court is the final word on the interpretation of Pennsylvania law, the Secretary maintained her request for our Court to grant King's Bench review. *Id.* ("[T]he district court's opinion, while timely and persuasive, is not authoritative. Only this Court can render the ultimate determination concerning Pennsylvania law.").

As indicated above, our Court granted the Secretary's application for invocation of our King's Bench authority because we determined the Secretary presented an issue of public importance that required our immediate intervention. *See supra* note 1. In our order granting review, we also granted the petitions to intervene of Donald J. Trump for President Inc., the Republican Party of Pennsylvania, the Republican National Committee, and the National Republican Congressional Committee ("Intervenors"). We denied the petitions for intervention of Elizabeth Radcliffe, a qualified elector, Bryan Cutler, Speaker of the Pennsylvania House of Representatives, Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives, Joseph B. Scarnati III, Pennsylvania Senate President Pro Tempore, and Jake Corman, Senate Majority Leader. However, these parties were granted leave to file *amicus* briefs.[12] We additionally granted leave for the Brennan Center for Justice, the Urban League of Pittsburgh, the Bucks,

---

[12] After the filing deadline set in our order, Senate President Pro Tempore Scarnati and Senate Majority Leader Corman filed an application for leave to file an *amicus* brief *nunc pro tunc*, alleging that technical difficulties with our electronic filing system prevented timely filing their *amicus* brief. We grant the application.

Chester, Montgomery and Philadelphia County Boards of Elections, and the Pennsylvania Alliance for Retired Persons to file *amicus* briefs.

## II. Arguments of the Parties

The Secretary first highlights the fact that, when a voter applies for a mail-in ballot, Sections 3150.12(a) and (b)(1)-(2) of the Election Code require the voter to fill out an application form listing his name, address, date of birth, voting district, and the length of time he has resided in the voting district.[13] According to the Secretary, the paper version of that form also requires a voter to sign a declaration that he or she is eligible to vote in the election for which he is requesting a ballot.[14] Upon receipt of this application, a county board of elections confirms whether the applicant is qualified to receive a mail-in ballot under Section 3250.12b by verifying the proof of identification supplied with the application, such as the voter's drivers' license number or the last four digits of the voter's social security number, and the county board compares that information with the voter's permanent registration card. The Secretary contends that this comparison process is all that is required by the Election Code, and that there is no provision therein which requires county boards of elections to compare signatures for purposes of verification, which is why, the Secretary points out, the application can be completed and submitted electronically through a Commonwealth website.

Once this verification is completed, the Secretary proffers that the Code requires the application be marked approved and a ballot issued. *See* 25 P.S. § 3150.12b(a)(1).

---

[13] The Secretary argues that absentee ballot application and approval procedures set forth in 25 P.S. §§ 3146.2 and 3146.2b are similar and, hence, for the sake of convenience, discusses only the mail-in balloting provisions.

[14] This form is available on the Secretary's website at https://www.votespa.com/Register-to-Vote/Documents/PADOS_MailInApplication.pdf.

The Secretary emphasizes that the only permissible challenge to the ballot application under Section 3150.12b(a)(2) is that the applicant was not a qualified elector.

With regard to the pre-canvassing and canvassing procedures for absentee and mail-in ballots set forth in Section 3146.8 of the Election Code,[15] the Secretary notes that the pre-canvassing process, which entails opening the ballot return envelopes, removing the ballots, and counting, computing and tallying them, can begin no earlier than 7:00 a.m. on election day. When the return envelope is opened during that process, according to the Secretary, the only examination which the county board may conduct under Section 3146.8(g)(3) and 3146.2c(c)[16] is to compare "the 'information' on the envelope—i.e., the

---

[15] Section 3146.8, by its title, "Canvassing of official absentee ballots and mail-in ballots," and its plain terms, governs both the pre-canvassing and canvassing of absentee and mail-in ballots.

[16] Section 3146.2c(c) provides:

> Not less than five days preceding the election, the chief clerk shall prepare a list for each election district showing the names and post office addresses of all voting residents thereof to whom official absentee or mail-in ballots shall have been issued. Each such list shall be prepared in duplicate, shall be headed "Persons in (give identity of election district) to whom absentee or mail-in ballots have been issued for the election of (date of election)," and shall be signed by him not less than four days preceding the election. He shall post the original of each such list in a conspicuous place in the office of the county election board and see that it is kept so posted until the close of the polls on election day. He shall cause the duplicate of each such list to be delivered to the judge of election in the election district in the same manner and at the same time as are provided in this act for the delivery of other election supplies, and it shall be the duty of such judge of election to post such duplicate list in a conspicuous place within the polling place of his district and see that it is kept so posted throughout the time that the polls are open. Upon written request, he shall furnish a copy of such list to any candidate or party county chairman.

25 P.S. § 3146.2c(c).

voter's name and address—with the names and addresses on the lists of approved absentee and mail-in voters." Secretary's Application for Extraordinary Relief, 10/04/20, at 19. The Secretary stresses that no other examination is permitted under the plain terms of the Code.

If the county board's examination determines that the declaration is sufficient, and the voter's name and address appears in the lists of approved absentee and mail-in voters, then, according to the Secretary, the Code requires the ballots to be counted. 25 P.S. § 3146.8(g)(3) and (4). The Secretary asserts that the only exception involves challenges to a voter's eligibility raised at the ballot application stage under Section 3150.12b(a)(2).[17] The Secretary contends that such challenges must be made by 5:00 p.m. on the Friday before election day and, thus, cannot be made during the pre-canvassing procedure (which does not begin until election day).

The Secretary argues that there is no provision of the Election Code which allows or requires the county boards of elections to entertain challenges "based on perceived signature mismatches," Secretary's Application for Extraordinary Relief, 10/04/20, at 20, or to reject absentee or mail-in ballots because of such an assessment. The Secretary notes that the General Assembly knows how to draft provisions requiring signature comparison, as it did for the in-person voting process governed by Section 3050(a.3)(2), which directs election officials to compare the signature of the voter signing the voter certificate at the polls with the district register, and then to make the determination of whether the signature on the voter certificate is genuine. Moreover, unlike for in-person

---

[17] *See also* 25 P.S. § 3146.2b(b) and (c) (limiting challenges to approval of application for absentee ballots to the ground that the applicant was not a "qualified absentee elector" or a "qualified elector").

voting, there is no provision in the Code which requires a voter to be notified that his signature has been challenged during the canvassing process; hence, a voter whose ballot is rejected during canvassing because of a perceived signature mismatch has no opportunity to respond to the challenge and have his ballot counted. In sum, the Secretary contends that requiring signature comparison during canvassing would improperly add a requirement to the Election Code which the legislature did not see fit to include.

Although the Secretary views the Election Code in this regard to be clear and unambiguous, she notes that, even if we were to find it to be ambiguous, we must still reject a signature comparison requirement, given that there are no standards or guidelines contained within the Code governing how an election official should perform such a comparison. In this vacuum, the Secretary asserts individual county boards will improvise "*ad hoc*" procedures, which would vary from county to county, creating a significant risk of error and uncertainty in the review of ballots. Secretary's Application for Extraordinary Relief, 10/04/20, at 24. In the Secretary's view, this would constitute a denial of equal protection to voters whose ballots were challenged and rejected under such varying and imprecise standards. This process would also present an "unjustified risk of disenfranchisement," *id.* at 25, given that a voter's ballot could be rejected without any opportunity to be heard on the issue.

Intervenors respond that the Election Code's use of the term "shall" in Sections 3146.6(a) and 3150.16(a) with respect to the requirement that electors sign the declaration on the outside of the ballot return envelope, together with the Code's companion requirement that county boards examine the declaration and determine if it is

"sufficient," mandates that county boards conduct signature verification. Intervenors Supplemental Brief at 6. Intervenors develop that, "because a voter's noncompliance with the signature mandate 'renders the ballot invalid,' that mandate necessarily contemplates the 'enforcement mechanism' of county boards engaging in—and invalidating ballots during the pre-canvass or canvass based upon—verification of the voter's signature." *Id.* Intervenors maintain that the "mandate" established by these statutory provisions "authorizes and requires signature verification and invalidation of ballots based upon signature mismatch." *Id.* Additionally, Intervenors maintain that, because Section 3148.8(g)(3) requires a determination of whether a declaration is "sufficient," and establishes that a declaration will only be sufficient when signed by the elector, this "encompasses the enforcement mechanism of signature analysis and verification during the pre-canvass and canvass." *Id.* Further, Intervenors insist that objections can be made at canvassing to ballots revealing signature mismatches.

Although contending that these provisions of the Election Code are clear, Intervenors assert that principles of statutory construction also support their suggested interpretation. Specifically, Intervenors maintain that signature comparison is necessary to prevent fraud, and that prior decisions from lower courts of the Commonwealth have endorsed this practice to effectuate this purpose. *See id.* at 7-8 (citing *Appeal of Orsatti*, 598 A.2d 1341 (Pa. Cmwlth. 1991); *In re Canvass of Absentee Ballots of Nov. 2, 1965, Gen. Election*, 39 Pa. D. & C.2d 429 (Montg. Cty. Common Pleas 1965); *Fogleman Appeal*, 36 Pa. D. & C.2d 426 (Juniata Cty. Common Pleas 1964); *In re City of Wilkes-Barre Election Appeals*, 44 Pa. D. & C.2d 535 (Luzerne Cty. Common Pleas 1967)). Intervenors also suggest the fact that, when a ballot return envelope is scanned upon

receipt by a county board of elections, the voter's registration card, which includes his or her signature, as contained in the Commonwealth's "SURE" ("Statewide Uniform Registry of Electors") system appears on the election official's computer screen. Intervenors view this fact as indicating that even the Secretary believes signature verification is required.

Addressing the potential impacts of the competing interpretations, Intervenors suggest that the Secretary's interpretation implicates due process and equal protection concerns, given that voters who vote in person are subject to signature verification, whereas those who vote by mail-in or absentee ballots would not be. Intervenors contend we should avoid an interpretation of the Code that results in such potential constitutional violations.

Intervenors rebuff the practical difficulties of implementing a system of signature verification raised by the Secretary, asserting that Chester County has already promulgated and produced such a system.[18] Intervenors further dispute that voters could be disenfranchised without their knowledge based on enforcement of a signature comparison requirement. They point to the notice, hearing, and judicial review provisions in Section 3146.8(g)(5)-(7) for adjudicating ballot challenges, which they contend would allow a voter whose signature has been challenged during canvassing to have the challenge adjudicated and thereby preserve their right to vote.

### III. Analysis

As the issue on which we accepted King's Bench review is purely one of statutory interpretation, our standard of review is *de novo,* and our scope of review is plenary. *Danganan v. Guardian Protective Services*, 179 A.3d 9, 15 (Pa. 2018). In

---

[18] Notably, Chester County filed an *amicus* brief supporting the Secretary's position.

matters of statutory interpretation, our objective is to ascertain and effectuate the intent of the General Assembly. *Id.*; *see also* 1 Pa.C.S. § 1921(a). As we have so oft observed, "[t]he best indication of legislative intent is the plain language of the statute." *Crown Castle NG East v. Pennsylvania Public Utility Commission*, 234 A.3d 665, 674 (Pa. 2020). In ascertaining the plain meaning of statutory language, we consider it in context and give words and phrases their "common and approved usage." *Commonwealth by Shapiro* v. *Golden Gate National Senior Care*, 194 A.3d 1010, 1027-28 (Pa. 2017). When the words of a statute are free and clear of all ambiguity, they are the best indicator of legislative intent; hence, in such circumstances, "we cannot disregard the letter of the statute under the pretext of pursuing its spirit." *Fletcher v. Pennsylvania Property & Casualty Insurance Guarantee Association*, 985 A.2d 678, 684 (Pa. 2009) (citing 1 Pa.C.S. § 1921(b)).

Turning to the text of the governing statutory provisions, Section 3146.8(g)(3) of the Election Code enumerates only three duties of the county boards of elections during the pre-canvassing and canvassing process:

(1) to "examine the declaration on the envelope of each ballot not set aside under subsection (d) [requiring rejection of ballots for deceased voters] and shall compare the information thereon with that contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File,' whichever is applicable";

(2) to verify "the proof of identification as required under this act," and

(3) to be "satisfied that the declaration is sufficient and the information contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File' verifies his right to vote."

25 P.S. § 3146.8(g)(3).

If an absentee or mail-in ballot comports with these statutory requirements, and it has not been challenged under Section 3146.2b (providing for challenges to approval of absentee ballot application on the ground that the applicant was not a "qualified absentee

elector," or a "qualified elector"), or Section 3150.12b (providing that the exclusive means for challenging a mail-in ballot application is "on the grounds that the applicant was not a qualified elector"),[19] then Section 3146.8(g)(4) requires the ballot to be considered "verified" and directs that it "shall be counted and included with the returns of the applicable election district." 25 P.S. § 3146.8(g)(4)(a). The only exception is set forth in Section 3146.8(g)(4)(ii), which requires that, "[i]f any of the envelopes on which are printed, stamped or endorsed the words 'Official Election Ballot,' contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void." *Id.* § 3146.8(g)(4)(ii).

To assess the signature analysis question before us, we review in turn each of the three canvassing duties set forth above from Section 3146.8(g)(3). First, as noted, the county boards must examine the declaration on the ballot return envelope and then "compare the information thereon with that contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File." *Id.* § 3146.8(g)(3).

Initially, we note that, with respect to the "Registered Absentee and Mail-in Voters File," it seems this file, previously utilized, is now a virtually empty relic. Prior to the recent Code amendments, subsection (a) of Section 3146.2c specified that this file was to

---

[19] As the Secretary has argued, the plain text of these provisions requires challenges to applications for mail-in ballot applications to be brought no later than 5:00 p.m. on the Friday before the election. 25 P.S. § 3150.12b(a)(2). Likewise, challenges to absentee ballot applications of registered voters, except for those permanently registered, must be brought by that same deadline. *Id.* § 3146.2b(c). Finally, challenges which are brought to a registered voter who is on the permanent registration list must be brought by the deadline for receipt of absentee ballots. *Id.* § 3146.2b(b). Hence, none of these challenges may be brought during the canvassing process.

contain duplicate "voter's temporary registration cards."[20] *See id.* § 3146.2c(a) (effective to Oct. 30, 2019). Indeed, the provision provided that these registration cards "shall constitute" the file, indicating the file had no other content. *Id.* Critically, however, with the passage of Act 12, the legislature deleted subsection (a). Act 12, § 8 (deleting 25 P.S. § 3146.2c(a)). Thus, while the canvassing provisions of 25 P.S. § 3146.8(g)(3) still require a voter's declaration to be compared against the file, that comparison would appear to be a meaningless exercise. The only informational remnant in the file, if it is still being maintained, is that set forth in Sections 3146.2(h) and 3150.12(e), requiring a voter's absentee and mail-in ballot application number to be entered in the file. Manifestly, there is no present requirement that the file contain the type of signature information necessary to perform the signature comparison Intervenors contend is mandatory.

With respect to a comparison of the declaration against the absentee voters' list and the "Military Veterans and Emergency Civilians Absentee Voters File," as highlighted by the Secretary, *see* Secretary's Application for Extraordinary Relief, 10/04/20, at 19 n.14, the only lists against which such a comparison may be conducted are those which

---

[20] This provision then provided, in full:

> The county board of elections shall maintain at its office a file containing the duplicate absentee voter's temporary registration cards of every registered elector to whom an absentee ballot has been sent. Such duplicate absentee voter's temporary registration cards shall be filed by election districts and within each election district in exact alphabetical order and indexed. The registration cards so filed shall constitute the Registered Absentee Voters File for the Primary or Election of (date of primary or election) and shall be kept on file for a period commencing the Tuesday prior to the day of the primary or election until the day following the primary or election or the day the county board of elections certifies the returns of the primary or election, whichever date is later. Such file shall be open to public inspection at all times subject to reasonable safeguards, rules and regulations.

25 P.S. § 3146.2c(a) (effective to Oct. 30, 2019).

the county boards are required to keep under subsections (b) and (c) of Section 3146.2c.

Those subsections provide:

> (b) The county board of elections shall post in a conspicuous public place at its office a master list arranged in alphabetical order by election districts setting forth the name and residence, and at primaries, the party enrollment, of (1) every military elector to whom an absentee ballot is being sent, each such name to be prefixed with an "M"; (2) every bedridden or hospitalized veteran outside the county of his residence who is not registered and to whom an absentee ballot is being sent, each such name to be prefixed with a "V"; and (3) every registered elector who has filed his application for an absentee ballot too late for the extraction of his original registration card and to whom a ballot is being sent and every qualified elector who has filed his application for an absentee ballot and is entitled, under provisions of the Permanent Registration Law as now or hereinafter enacted by the General Assembly, to absentee registration prior to or concurrently with the time of voting, each such name to be prefixed with a "C." This list shall be known as the Military, Veterans and Emergency Civilians Absentee Voters File for the Primary or Election of (date of primary or election) and shall be posted for a period commencing the Tuesday prior to the day of the primary or election until the day following the primary or election or the day on which the county board of elections certifies the returns of the primary or election, whichever date is later. Such file shall be open to public inspection at all times subject to reasonable safeguards, rules and regulations. This posted list shall not contain any military address or reference to any military organization. Upon written request, the county board shall furnish a copy of such list to any candidate or party county chairman.
>
> (c) Not less than five days preceding the election, the chief clerk shall prepare a list for each election district showing the names and post office addresses of all voting residents thereof to whom official absentee or mail-in ballots shall have been issued. Each such list shall be prepared in duplicate, shall be headed "Persons in (give identity of election district) to whom absentee or mail-in ballots have been issued for the election of (date of election)," and shall be signed by him not less than four days preceding the election. He shall post the original of each such list in a conspicuous place in the office of the county election board and see that it is kept so posted

until the close of the polls on election day. He shall cause the duplicate of each such list to be delivered to the judge of election in the election district in the same manner and at the same time as are provided in this act for the delivery of other election supplies, and it shall be the duty of such judge of election to post such duplicate list in a conspicuous place within the polling place of his district and see that it is kept so posted throughout the time that the polls are open. Upon written request, he shall furnish a copy of such list to any candidate or party county chairman.

25 P.S. § 3146.2c(b) and (c).

Notably, the only information required to be kept in these lists is, as the Secretary highlights, the names and addresses of registered voters, and, in the case of voters serving in the military, even their addresses need not be disclosed. Consequently, in comparing a declaration against these lists, a county board may determine only whether the name and address information the voter has listed on the ballot envelope matches.[21] There is no signature information in these lists for county election officials to compare against a voter's signature on his declaration; therefore, pursuant to the plain language of the Election Code, these lists cannot facilitate the signature comparison Intervenors maintain is required.

Next, in canvassing the ballots under Section 3146.8(g)(3), the county boards must verify "the proof of identification as required under this act." As indicated above, *see supra* note 9, Section 2602(z.5)(3)(i)-(iv) of the Election Code enumerates the various *types* of identification which a voter may utilize in completing a ballot application. Consequently, we conclude the county board's duty in this regard is to check the identification listed on the voter's mail-in or absentee ballot to see if it is of the *type* permitted by the Election Code, and to verify that it is valid. This duty does not, however, require or authorize county boards to go further and compare the signature on the voter's

---

[21] This comparison process operates to eliminate ballots of voters who have provided a different name entirely than that which appears on these lists.

mail-in or absentee ballot to ensure that it is the same as that which appears on the form of identification the voter has listed on the application. Hence, this unambiguous provision likewise does not permit or require signature comparison.

Finally, a county board is required to determine if the ballot declaration is "sufficient." 25 P.S. § 3146.8(g)(3). The requirements for a ballot declaration are set forth in Section 3146.6(a) (absentee ballots) and Section 3150.16(a) (mail-in ballots). Both sections require that the elector "fill out, date and sign the declaration." *Id.* §§ 3146.6(a), 3150.16(a). Thus, in determining whether the declaration is "sufficient" for a mail-in or absentee ballot at canvassing, the county board is required to ascertain whether the declaration on the return envelope has been filled out, dated, and signed. This is the extent of the board's obligation in this regard. In assessing a declaration's sufficiency, there is nothing in this language which allows or compels a county board to compare signatures. Accordingly, we decline to read a signature comparison requirement into the plain and unambiguous language of the Election Code, as Intervenors urge us to do, inasmuch as the General Assembly has chosen not to include such a requirement at canvassing.

Even if there were any ambiguity with respect to these provisions, we observe that the General Assembly has been explicit whenever it has desired to require election officials to undertake an inquiry into the authenticity of a voter's signature. *See, e.g.*, 25 P.S. § 3050(a.3)(2) (governing procedures for in-person voting at polling places and requiring an "election officer" to "compare the elector's signature on his voter's certificate with his signature in the district register," and based "upon such comparison . . . if the signature on the voter's certificate, as compared with the signature as recorded in the district register, *shall not be deemed authentic by any of the election officers*, such elector shall not be denied the right to vote for that reason, but shall be considered challenged

as to identity," and requiring the voter to execute an affidavit and provide proof of his identity in order to vote (emphasis added)); *id.* § 3050(a.4)(5)(i) ("Except as provided in subclause (ii), if it is determined that [an individual who attempts to cast an in-person ballot at a polling place, but whose name did not appear on the district register of eligible voters] was registered and entitled to vote at the election district where the ballot was cast, the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form *and, if the signatures are determined to be genuine*, shall count the ballot if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election." (emphasis added)).

In this regard, we note that, when the Election Code was first promulgated by the General Assembly in 1937, it contained explicit signature comparison requirements for canvassing certain absentee ballots. *See* Act of June 3, 1937, P.L. 1333, No. 320. Article XIII of that law, a precursor of the current mail-in ballot procedures, provided certain military service members the right to use mail-in ballots, referred to as "Detached Soldier's Ballots." Similar to today's mail-in ballots, the service member was required to complete an affidavit on an outer envelope, along with the jurat of his witnessing officer, and then place his completed ballot inside that outer envelope. *Id.* § 1329. In canvassing such ballots, the county boards were instructed to "open such registered letter and after examining the affidavit and jurat, [to] *compare the signature of such absent voter with his signature upon any register or other record in their possession. If the county board is satisfied that the signatures correspond and that the affidavit and jurat are sufficient*, they shall announce the name of the elector and shall give any person present an opportunity to challenge the same . . . ." *Id.* § 1330 (emphasis added). Absent any challenge, such

ballots were counted. Notably, in 1945, this signature comparison language was removed from the Code.[22]

We draw two inferences from this early history. First, the legislature understands how to craft language requiring signature comparisons at canvassing when it chooses to do so, as it did in 1937. Second, in the 1937 Code, the legislature drew a clear distinction between assessing the *sufficiency* of the ballot affidavit (and jurat) and a *comparison* of the ballot signature. The legislature having subsequently stripped out the signature comparison language from the Code, we ought not to construe, as Intervenors suggest, the remaining sufficiency determination as incorporating a signature comparison.

Our conclusion that Section 3146.8(g)(3) of the Election Code does not impose a duty on county boards to compare signatures is also consistent with the recent evolution of the Election Code, wherein the legislature expanded the allowances for voting by mail. Notably, at the same time it liberalized voting by mail, the legislature first restricted, and then eliminated, the ability of third-parties to challenge ballots at canvassing.

Prior to the recent Code amendments, absentee ballots were the only permissible form of voting by mail. At that time, at canvassing, after a county board was satisfied that the declaration on an absentee ballot was sufficient, the Code provided that the board "shall announce the name of the elector and shall give any candidate representative or party representative present an opportunity to challenge any absentee elector" on

---

[22] Act of March 9, 1945, P.L. 29, No. 17, §§ 9-10. Thereafter, as set forth in the 1945 amendment, the county board was required to maintain a "Military File" containing the names and addresses of service members sent absentee ballots, *id.* § 10 (reenacting Section 1305 of Act of 1937), something akin to the "Military Veterans and Emergency Civilians Absentee Voters File" in the present Election Code. Also, like the current Code, at canvassing, the board was required to review only the ballot affidavit (and jurat) to determine "[i]f the board is satisfied that the affidavit and jurat are sufficient and that the elector has qualified." *Id.* § 10 (reenacting Section 1307 of Act of 1937). Thus, signature comparison was no longer part of the county board's canvassing obligations.

specified grounds. *See* 25 P.S. § 3146.8(g)(3) (effective Nov. 9, 2006 to Mar. 13, 2012).[23] There were three permissible grounds for challenge: that the absentee elector was not a qualified elector; that the absentee elector, despite alleging otherwise, was present in his municipality of residence on election day; or that the absentee elector, despite alleging otherwise, was in fact able to appear at the polling place on election day. *Id.*

However, when the legislature first allowed for no-excuse mail-in voting in 2019, the legislature simultaneously reduced the bases on which canvassing challenges could be made by eliminating the present-in-his-municipality objection (albeit while allowing the remaining challenges to be asserted against mail-in ballots). *See* Act 77, § 7 (amending 25 P.S. § 3146.8(g)(3)). Then, in 2020, the legislature eliminated time-of-canvassing challenges *entirely* from Section 3146.8(g)(3). *See* Act 12, § 11 (amending 25 P.S. § 3146.8(g)(3) to eliminate the challenging grounds and procedures, and amending Section 3146.8(g)(2) to eliminate the proviso that "Representatives shall be permitted to challenge any absentee elector or mail-in elector in accordance with the provisions of paragraph (3)"). Accordingly, the Election Code presently provides no mechanism for time-of-canvassing challenges by candidate or party representatives. *See* 25 P.S. § 3146.8(g)(4) ("All absentee ballots which have not been challenged under section 1302.2(c) [pertaining to absentee ballot *applications*] and all mail-in ballots which have not been challenged under section 1302.2-D(a)(2) [pertaining to mail-in ballot *applications*] and that have been verified under paragraph (3) shall be counted and included with the returns of the

---

[23] A similar procedure was provided to allow poll watchers to challenge ballots. 25 P.S. § 3146.8(e) (effective Nov. 9, 2006 to Mar. 13, 2012). However, this procedure was deleted in its entirety in 2019. *See* Act 77, § 7 (deleting 25 P.S. § 3146.8(e)).

applicable election district . . . .").[24]  Moreover, as is plain from the above account, at no time did the Code provide for challenges to ballot *signatures.*[25]

Presumably, in expanding voting by mail, the legislature sought to streamline the process for canvassing such ballots, perhaps to avoid undermining the expansion effort by eliminating the prospect that voters – including a potentially large number of new mail-in voters – would be brought before the board or the courts to answer third-party challenges.  Regardless, Intervenors would have us interpret the Election Code, which now does not provide for time-of-canvassing ballot challenges, and which never allowed for signature challenges, as both requiring signature comparisons at canvassing, and allowing for challenges on that basis.  We reject this invitation.

It is a well established principle of statutory interpretation that that we "may not supply omissions in the statute when it appears that the matter may have been intentionally omitted."  *Sivick v. State Ethics Commission,* 2020 WL 5823822, at \*10 (Pa. Oct. 1, 2020).  It is not our role under our tripartite system of governance to engage in judicial legislation and to rewrite a statute in order to supply terms which are not present therein, and we will not do so in this instance.

### IV. Conclusion

---

[24] Admittedly, there are some vestiges remaining in the Election Code of the prior, now eliminated, system for time-of-canvassing ballot challenges.  *See*, *e.g.*, 25 P.S. § 3146.8(f) (requiring a $10 deposit for each challenge to an absentee or mail-in ballot application *or ballot*); *id.* § 1308(g)(5) (discussing procedures for handling "[b]allots received whose applications have been challenged and *ballots which have been challenged*" (emphasis added)).  Now untethered to a procedure for asserting time-of-canvassing challenges in Section 3146.8(g)(3), however, we view the references to ballots in these provisions to be the overlooked remnants of a prior, now eliminated, process.

[25] For this reason, we reject Intervenors' contention that the notice, hearing, and judicial review provisions in Section 3146.8(g)(5)-(7) pertain to adjudicating signature challenges.

For all of the aforementioned reasons, we grant the Secretary's petition for declarative relief, and hold that county boards of elections are prohibited from rejecting absentee or mail-in ballots based on signature comparison conducted by county election officials or employees, or as the result of third-party challenges based on signature analysis and comparisons.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty and Wecht join the opinion.

Justice Mundy concurs in the result.